## Nimlet's Estate.

*S. Lloyd Moore, James F. Hagen* and *William H. Peace,* for exceptants.
*Thomas Kilby Smith* and *White & Wetherill,* contra.

THOMPSON, J., March 15, 1929.—The exceptions before us are those filed to the action of the Auditing Judge in allowing the claim of James L. Whitaker for the return of the hand-money paid by him on a contract with the decedent, as follows:

"This Agreement made this tenth day of June, A. D. One Thousand Nine Hundred and Twenty-five (1925), between Mary A. Nimlet, party of the first part, and James L. Whitaker, party of the second part, Witnesseth:

"The said party of the first part agrees to sell and convey to the said party of the second part, who agrees to purchase all her 70/261 interest in All That Certain tract or piece of ground, consisting of approximately Ninety-six (96) acres, Situate at Adams Avenue and Tabor Road, known as the Whitaker Tract, and particularly mentioned and described in a certain deed from Robert Whitaker et ux. et al. to Robert Whitaker and James L. Whitaker, Trustees, dated February 1, 1923, and recorded February 20, 1923, in Deed Book J. M. H., No. 1548, page 36, etc., the dimensions of the tract to be accurately determined by an official survey to be produced by the party of the first part at 70/261 of her expense, on the terms and conditions as follows, to wit:

"The party of the second part agrees to pay for the said interest in the said property of ninety-six (96) acres at the rate of Nine Thousand Five Hundred Dollars ($9500) per acre, without commission, as follows: Six Thousand Seven Hundred and Five Dollars ($6705) thereof in cash upon the signing of this agreement, which deposit shall be forfeited to the said party of the first part as liquidating damages in case of default by the said party of the second part in the performance of the terms of this agreement, and the balance of the said purchase money as follows: Eighty per cent. (80%) thereof to be secured by a valid first mortgage, payable at any time within three (3) years, with interest thereon semi-annually at the rate of six per cent. (6%) per annum, and the balance of the said purchase money to be paid in cash at the time of settlement.

"The premises are to be conveyed free and clear of all encumbrances and easement which affect the marketability of the title.

738

"The beds of all streets plotted and appearing upon the said plan are included in the premises.

"The party of the second part agrees to take subject to all plotted streets, sewers or municipal plottings for park purposes.

"70/261 of any existing encumbrance or encumbrances on the said premises at time fixed for settlement to be paid out of the purchase money.

"Possession is to be given at the time of settlement, except for small tenement houses on the premises, and possession of such tenement houses to be given by assignment of interest in existing leases.

"70/261 of taxes, water rent, interest on encumbrance, if any, to be apportioned for this current term.

"Title is to be such as will be insured by any reputable Title Insurance Company of the City of Philadelphia at current rates.

"The said parties hereby bind themselves, their heirs, executors and administrators, for the faithful performance of the above agreement within four (4) months from the date of this agreement.

"The said time herein mentioned to be the essence of this agreement unless extended by mutual consent in writing endorsed hereon.

"The party of the first part agrees that the party of the second part shall not be in any way held liable, as Trustee, by her by reason of the sale of this interest in said property at a higher figure.

"In Witness Whereof, the said parties have hereunto set their hands and affixed their seals the day and year first above written.

|  |  |
|---|---|
| | MARY A. NIMLET (Seal) |
| "Sealed and Delivered | JAMES L. WHITAKER (Seal) |
| in the presence of | |
| JOHN B. SIDEBOTHAM | |
| ALLEN M. STEARNE | |

"Received the day of the date of the within agreement the sum of Six Thousand Seven Hundred and Five Dollars ($6705) on account of the purchase money named therein.

"JOHN B. SIDEBOTHAM,
"Atty. in fact for Mary A. Nimlet.

"Received of James L. Whitaker Two hundred and ninety-five dollars additional deposit.                                        JOHN B. SIDEBOTHAM."

There is no substantial dispute as to facts which may be stated by quoting from the opinion of Judge Ferguson, filed in the account of Robert and James L. Whitaker, Trustees, and The Second National Bank, Succeeding Trustee, as stated by James L. Whitaker, Common Pleas No. 3, as of September Term, 1925, No. 8603:

"In 1923, Robert Whitaker and James L. Whitaker became vested with a large tract of ground, composed of five smaller tracts, located in the 35th Ward of the City of Philadelphia, the whole being approximately ninety-seven acres. Robert Whitaker and James L. Whitaker held title as trustees under a certain deed of trust; the trust, in brief, being one to hold the property for a period of five years and to sell the same and to distribute the proceeds among certain members of the Whitaker family in the following proportions: To Robert Whitaker, 70/261; to James L. Whitaker, 23/261; to Mary A. Nimlet, 70/261; to Catherine Whitaker, 70/261; to John Whitaker, 14/261; to Annie L. Whitaker, 7/261; and to John Cecil Whitaker, 7/261. It is unnecessary to recite the other details of the trust.

"Robert Whitaker, one of the trustees, died Feb. 18, 1925. Prior to his death there had been efforts made to sell the ground, with no result excepting the sale of a small tract of two-thirds of an acre to a man named Hartman. On April 27, 1925, a meeting of the parties interested was had to select a new trustee in his place, and the Second National Bank of Philadelphia was selected as such trustee, and a certificate was duly prepared and signed and acknowledged, but not recorded, as required by the deed of trust. In March, 1925, James L. Whitaker and a man named Mallon, of the real estate firm of Kelly & Mallon, went to the office of the Second National Bank, and Mallon made an offer to purchase the entire property at $8000 an acre. Whitaker was willing to sell the tract at that price, but the bank was not. Within a week Whitaker and Mallon went to the office of the bank, and Mallon submitted an offer of $8500 an acre. Whitaker was willing to sell at that price, but the bank was not. When the bank refused to agree to sell to Kelly & Mallon's client at $8500 per acre, Whitaker notified the bank that he would hold it responsible for any loss that might be sustained by reason of that refusal. It was understood that if a sale was made at $8000 or $8500 an acre that Kelly & Mallon were to receive a broker's commission of 5 per cent. Shortly after this the bank obtained a purchaser at $9500 an acre, and executed a contract subject to the approval of its co-trustee. Whitaker refused to execute the contract, and, as a consequence, a meeting of the family was had for the purpose of determining whether or not the sale should be approved.

"At that meeting Mrs. Robert Whitaker, who stood in the place of her deceased husband, Robert Whitaker, and Mrs. Mary A. Nimlet, each of whom was entitled to a 70/261 interest in the proceeds of sale, were represented by an attorney-in-fact. They were satisfied with the sale. James L. Whitaker was not, and declared that he knew it was possible to obtain $10,000 an acre for the property. It was understood that the sale at $9500 an acre would be subject to a broker's commission of 5 per cent. James L. Whitaker, in order to prevent a decision requiring the sale at $9500 an acre, proposed in writing to Mrs. Whitaker and Mrs. Nimlet that he would buy their interest at a price which would net $9500 an acre for the whole, free from a broker's commission, provided that it was understood that he bought as an individual and should not be charged as a trustee with any profit he might make on their shares. This offer was accepted in writing, and two days later two formal agreements were made, in which James L. Whitaker agreed to purchase the interests referred to, and $7000 was paid on account of the purchase money to each of the other parties to the contracts. This money was paid out of Whitaker's own funds or funds which he borrowed from the man who subsequently bought the property. These contracts were never consummated.

"Shortly after, Whitaker procured, through the intervention of the same brokers who had previously made the offers of $8000 and $8500 per acre, a contract for the purchase of the land at $10,000 an acre. This contract was submitted to the Second National Bank and it was executed, and in October, 1925, the sale was consummated and the proceeds paid to the trustees. These proceeds are the subject of the account now before the court.

"There appears in the account an item of $19,231.86, being commissions to the accountant; an item of $15,000 to Thomas Kilby Smith, counsel for James L. Whitaker, one of the trustees; and there are two other items of $7000 each which are claimed as credits. These items are the two sums paid to Mrs. Whitaker and Mrs. Nimlet on account of the purchase price of their shares, and it is asked that the items be allowed as credits and charged against their distributive shares and added to the share of James L. Whitaker.

740

"The four items have not actually been paid out and, therefore, they must be regarded as credits which are asked for. There has been an absurd attitude of antagonism shown by James L. Whitaker to his co-trustee, the Second National Bank. It was to be expected that there might be differences of opinion between two trustees as to the value of the land. Trustees frequently have these differences and they seem to have been no greater in this case than often occurs. The trustees had but one duty to perform, and that was to sell the property, and it is to be presumed that each was trying to do the best he could for the estate. James L. Whitaker was willing to sell at $8000 or $8500 an acre, and the bank was not. In view of the sequel, the bank rendered a very valuable service to the estate in standing out for a higher price. The bank obtained an offer of $9500 an acre, with which Whitaker was dissatisfied, and they both finally agreed upon a sale at $10,000 an acre. In spite of this service rendered by the bank, counsel for James L. Whitaker, at the opening of the audit, seriously contended that, by reason of the misconduct of the bank, the bank was entitled to no commission. Evidence of such misconduct is not to be found anywhere in the voluminous notes of testimony.

"Notwithstanding the fact that the sale was consummated by both trustees and the proceeds of sale were deposited to the joint account of the trustees, an account was prepared by counsel for James L. Whitaker and filed in court without it being submitted to the bank for approval and signature. The bank is, therefore, not responsible in any way for the form of the account. In addition, a threat was made by James L. Whitaker, after he made the contract to purchase the two interests of Mrs. Whitaker and Mrs. Nimlet, that, since he was then the owner in prospect of more than one-half of the estate, he would have the bank removed as trustee. Apparently, he suppressed and refused to produce to the bank the certificate of the appointment of the bank as trustee after it came back from California, where it had gone for signature. This circumstance delayed for a day or two the settlement of the sale, the bank being unwilling to sign the deed until the certificate was produced. These facts are a sufficient recital of the incidents surrounding the sale of the property to form a basis for a discussion of the several matters which have to be passed upon by the Auditing Judge.

"1. *The claims against Mary E. Whitaker and Mary A. Nimlet of $7000 each.*

"As above stated, these items are claimed as credits with a view of having them charged against the distributive shares of the two women. Agreements in writing having been made for the sale of those shares to James L. Whitaker, and those agreements never having been consummated, the two women necessarily appear before the court as claimants of their shares of the proceeds. Why the sales were not consummated cannot be determined by this court; neither can the rights of the parties with respect to the $7000 paid to each of the women be adjudicated. The contracts were not different in substance from contracts to purchase real estate on which a deposit had been paid. They were made between individuals. James L. Whitaker executed the contracts as an individual, and in each stipulated that the parties with whom he contracted should not in any way hold him as a trustee to be accountable to them if a subsequent sale realized a higher price. If the contracts were not consummated as a result of Whitaker's default, it is probable he has no right to ask the return from each of these women of the $7000 paid. If the contracts failed because of the default of the women, he has an action against them to recover the deposit money. The rights of the parties cannot be determined here. There is no issue raised under which the questions involved could

be settled. It is a private matter between individuals, and James L. Whitaker cannot in a trustee's accounting ask the court to adjudicate his personal controversies.

"As a consequence of the failure to consummate these contracts, an enormous expense is imposed upon the two women with whom James L. Whitaker contracted. Owning, as they do, more than one-half of the estate, they thus become obligated to pay more than one-half of the broker's commission of $49,079.65; commissions to accountants of $19,231.86, and such counsel fees as are allowed. Had the sales to James L. Whitaker been consummated, they would have borne none of this expense. The result to them, therefore, is a very substantial loss, which cannot be covered or recouped by the $14,000 paid them. It may be that the prospect of these charges against himself as their successor may have induced James L. Whitaker to refuse to carry out the contract, but, as above stated, these questions cannot be determined in this accounting. It was attempted to be shown that this expenditure was one made for the protection of the estate. The whole transaction shows on its face that this was not the case."

The Auditing Judge's views [i. e., Judge Wilhelm's views] can best be shown by an extract from his adjudication:

"Within ten days after the execution of the agreement, James L. Whitaker, by his counsel, T. Kilby Smith, gave notice to Allen M. Stearne, attorney for Mrs. Nimlet, of his fear of the impossibility of carrying the sale as specified in the agreement into effect, and calling attention to the fact that the agreement of sale provides that Mr. Whitaker shall get clear title, and refers to a conversation in which this matter was enlarged upon; that is, 'the impossibility or at least the difficulty of carrying it into effect.'

"Therefore, the thought of James L. Whitaker that Mrs. Nimlet would not be able to carry out her part of the agreement was conveyed to her at an early date, with the suggestion that the agreement be canceled for the purpose of promoting peace and harmony.

"At the time fixed for the settlement, the parties met, and James L. Whitaker was prepared to carry out his part of the contract, in that he had with him the amount of cash to be paid and a mortgage to be delivered to secure the payment of the balance due upon the contract. Mrs. Nimlet had her deed of conveyance prepared and ready for execution, and the deed of John B. Hartman, which would remove certain restrictions incident to the land, contained in a deed executed and delivered by the trustees to John B. Hartman. James L. Whitaker, through his counsel, called attention to the fact that Mrs. Nimlet could not convey title to the land because she had no title; that the land would not be free from encumbrance, in that there were two mortgages against the land, aggregating $143,000, which were to remain a lien on the land, excepting the proportionate part which Mrs. Nimlet was obligated to pay, and that the title insurance proposed to be issued, as shown by the settlement certificate issued by the Land Title and Trust Company, was not to cover the title to the land, but her title to personal property; that is, Mrs. Nimlet's interest in the trust. Because Mrs. Nimlet was unable to convey the land, and unable to convey it free of encumbrances, and unable to have insured the grantee's title in the land, James L. Whitaker refused to pay the balance of the cash and to deliver his mortgage.

"It appears that neither of these parties, strictly speaking, was able to carry into effect this agreement. That is, Mrs. Nimlet was unable to perform her part of it, as above recited, and James L. Whitaker was unable to give to Mrs. Nimlet a first mortgage upon the land, as he agreed to do, because it is

admitted that there would remain upon the land prior mortgages after Mrs. Nimlet had paid her proportionate share due from her upon the same.

"Therefore, we have these contracting parties each agreeing to do something impossible under the circumstances. It cannot be said that either of the contracting parties was deceived or misled by the other. Both of them knew that the title to the land was not in Mrs. Nimlet, but was in trustees under an agreement by both parties as well as others in interest. Both of them knew of the existing mortgages upon the property and that these mortgages would not be paid at the time fixed for the settlement.

"It is intimated that James L. Whitaker discovered, soon after the execution of the agreement, that it was an improvident or losing one for him, and that he took steps to avoid his obligation for that reason. The conduct of James L. Whitaker in this respect might be of large import if Mrs. Nimlet had been able to perform her part of the contract, and Mrs. Nimlet's ability to perform is the important question here, because she is here claiming a forfeiture because of a breach on the part of James L. Whitaker.

"It is alleged by the Estate of Mary A. Nimlet that the agreement did not contemplate the conveyance of real estate, but covered only the equity that Mrs. Nimlet had in real estate; therefore, the mortgages upon the land were not an encumbrance contemplated by the agreement. It is established beyond dispute that the title to the land was in trustees and this trust estate had been in existence since Feb. 1, 1923. When there is no provision to the contrary, a trust estate is always subject to the costs, fees and charges incident to its administration, which are a lien upon the property. Webster's law definition of an encumbrance is 'A burden or charge upon property. A claim or lien upon an estate which may diminish its value. Any interest or right in land existing to the diminution of the value of the fee, but not preventing the passing of the fee by conveyance.' This definition has been adopted by the courts of a number of states, including Pennsylvania. It may confidently be said that Mrs. Nimlet's interest in the equity which she had in the land was encumbered by the costs incident to the administration of the trust estate. Her attention was called to this encumbrance, and at the time fixed for settlement she was not prepared to discharge the encumbrance or pay her proportion. The agreement provided that she was to convey, whether it was real estate or personal property, free and clear of encumbrance; something which she was not prepared to do in either case; therefore, she was not in position to declare a forfeiture of the down-money. Courts do not favor a forfeiture, and will only enforce it in a clear case and never in a doubtful one: Stanton v. Pittsburgh, 257 Pa. 361.

"Both parties to this contract knew all the facts and circumstances concerning the land, the title thereto, the encumbrances thereon and the interest of each therein. Neither deceived or attempted to deceive the other. Notwithstanding this, they entered into a contract which both of them knew, or should have known, was a legal impossibility; that is, an impossibility in law apparent when the agreement was made. Where parties make an agreement and they are ignorant at the time that performance of the contract is impossible, there is no contract, if it appears from the construction of the agreement that it was intended to be conditional upon a supposed possibility of performance. There is a mistake here which renders the agreement void: 9 Cyc., 627.

"It is concluded, therefore, that there was no breach of this contract by James L. Whitaker; that Mrs. Nimlet was unable to perform her part of the contract; therefore, in no position to declare a breach and declare a forfeiture

of the down-money. It is undisputed that the down-money was paid by James L. Whitaker to Mrs. Nimlet and has never been repaid; therefore, there is due to James L. Whitaker from the Estate of Mary A. Nimlet the down-money which he paid, to wit, the sum of $7000."

We cannot agree with the above conclusion of the Auditing Judge that Mrs. Nimlet was unable to perform her part of the above contract. In his adjudication he says that, under the contract, Mrs. Nimlet was required to satisfy the $140,000 mortgage on the tract. She was not so required, for the parties themselves had stipulated that Mrs. Nimlet's share of this mortgage should be deducted from the purchase price, and, in so far as Mrs. Nimlet's responsibility for her share of the administration of the trust is concerned, the deed of trust requires specifically that "necessary expenses attendant upon the trust shall be borne by the parties beneficially interested in the proportions hereinbefore stated, and it shall be the duty of the said trustees or their successors in the trust to levy on the parties beneficially interested in proportion to their interests a sufficient sum to meet such taxes and charges."

At the time of the sale, and at the time fixed for settlement, there was no evidence that Mrs. Nimlet had not paid all her share of the expenses up to that time, and it certainly could not be considered that she was required to indemnify Whitaker for all future expenses of the trust after the sale. We call attention to the fact that the person who held this $140,000 mortgage was the Land Title and Trust Company, and they themselves offered their title policy free of this mortgage. Furthermore, at the time fixed for settlement in October this property had been sold for $10,000 an acre and settlement was to take place in a day or so, and this $140,000 mortgage would then have been paid out of the settlement. Aside from this, if there was any question as to Mrs. Nimlet's liability for the mortgage or expenses of the trust, as Whitaker was to give back a purchase-money mortgage to Mrs. Nimlet for nearly $200,000, a proper construction of the contract would have required him to pay whatever he had to pay out of the deferred purchase price.

It appears to us that when Whitaker bought this property he never intended to make settlement with Mrs. Nimlet. The only reason he bought it was because his co-trustee would not agree to sell at the moment, and he wanted to take advantage of the trust agreement that if there was a difference of opinion among the trustees, a majority interest would control. Whitaker was interested in the buying end of this contract, as is shown by the fact that when he bought from Mrs. Nimlet, it was expressly stipulated that she would not hold him accountable for any profit he would make out of the sale. When he found, after he had bought from Mrs. Nimlet, that his co-trustees would go along and sell at a higher price, there was no necessity for him buying Mrs. Nimlet's share, and, therefore, he wanted his money back. We cannot possibly see any difficulty in carrying out the agreement, not only as it is written, but as all the facts concerning the same justify one in concluding why Whitaker bought and why he did not settle. This is the ordinary case of one co-owner buying out another co-owner.

In Judge Ferguson's analysis of the facts on the settlement of the trustees' account he says that Mrs. Nimlet is a very substantial sufferer by reason of Whitaker not having completed his purchase from her. She is obliged to pay her share of commissions and legal expenses, none of which was incurred at the time she sold to Whitaker, and we know of no case where a defaulting purchaser who has occasioned his vendor substantial damage can ever get back his deposit money, where the vendor was ready and willing and anxious to complete: Dluge v. Whiteson, 292 Pa. 334. And for a case where the

court has reconciled apparently inconsistent clauses in a contract, see Sipp *v.* Philadelphia Life Ins. Co., 10 D. & C. 250. In Harrity *v.* Continental-Equitable Title and Trust Co., 280 Pa. 237, the syllabus is as follows:

"A contract must be so construed, if possible, as to give effect to all of its provisions.

"An interpretation will not be given to one part of a contract which will annul another part of it or produce absurd results.

"A clear provision in a written contract cannot be overcome by one that is doubtful.

"Where there is a repugnancy, a general provision in a contract must give way to a special one covering the same ground.

"Where several joint-owners of real estate execute a deed of trust, by which the trustee is given discretionary power to rent and sell the property, and the owners reserve no rights therein except to share in the proceeds, such power of sale given to the trustee is not defeated by a later clause in the agreement which provides that any dispute among the owners as to 'the management of the business' shall be settled by a majority in interest."

The agreement of Mrs. Nimlet to convey clear of encumbrances would have been the law without its being inserted in the contract; but where they specifically provide that Mrs. Nimlet's share of existing liens and encumbrances should be deducted from the purchase money, no one can successfully contend that a fair construction of the agreement of sale would require Mrs. Nimlet to pay off in full existing mortgages, particularly where it appears she did not owe all the money represented by the mortgage, but that her co-owners, including Whitaker, also owed their proportionate part of the $140,000 mortgage; the construction of the Auditing Judge would require her to pay Whitaker's debt, as well as the debt of her co-owners, which, in our judgment, leads to an absurd conclusion. The claim of Mr. Whitaker is disallowed.

The exceptions are sustained and the adjudication as thus modified is confirmed.

VAN DUSEN and STEARNE, JJ., did not sit.

WILHELM, J., who sat on the argument of the exceptions, desires to note his dissent to the above opinion.